Hillsborough
No. 86-515

### THE STATE OF NEW HAMPSHIRE

v.

### MICHAEL GUGLIELMO

December 31, 1987

Stephen E. Merrill, attorney general (Steven L. Winer, assistant attorney general, on the brief and orally), for the State.

Joanne Green, assistant appellate defender, of Concord, by brief and orally, for the defendant.

THAYER, J. The defendant, Michael Guglielmo, was indicted on six counts of attempted murder of Officers Murphy, Jones, Doherty, Putney, Alexacos, and Lussier. After the close of the State's evidence, the defendant moved for dismissal or, alternatively, for reduction of the attempted murder charges to reckless conduct. The Superior Court (Pappagianis, J.) granted the motion as to Officer Murphy, and the defendant pleaded guilty to that reckless conduct charge.

On the five remaining charges, the jury found the defendant guilty of the lesser-included offenses of attempted first-degree assault of Officers Jones, Doherty, and Putney, and of reckless conduct with respect to Officers Alexacos and Lussier.

The defendant moved to set aside the conviction for the attempted first-degree assault of Officer Jones on the following two grounds: (1) that the facts supporting the conviction were insufficient for the jury to find him guilty of that charge; and (2) that the facts were indistinguishable from those underlying the reckless conduct conviction concerning Officer Murphy. The motion was denied.

The trial court sentenced Guglielmo to three consecutive terms of seven and one-half to fifteen years on the three attempted first-degree assault convictions, and to three consecutive terms of one year, suspended, on the three reckless conduct convictions. The defendant appealed the trial court's denial of his motions to dismiss or reduce the charges, and we affirm for the reasons stated below.

The main question raised by the defendant is whether the evidence was sufficient to sustain the attempted first-degree assault charges involving Officers Jones, Doherty and Putney.

The testimony at trial established the following facts. At approximately 4:00 a.m. on December 30, 1985, the Manchester Police Department received a call from a resident of 611 Montgomery Street stating that the defendant, Michael Guglielmo, was firing an automatic "MAC-10" weapon inside the building. Officers Colby, Hewitt and Murphy responded to the call. When they arrived at the scene, the resident who had called met them in the rear alley of 611 Montgomery Street. From the alley Officer Colby could see a person at the second-floor window with an object in his hand. The resident of the house identified that individual as the person firing the weapon.

Officer Jones arrived shortly after Officers Colby, Hewitt and Murphy and positioned himself on the west porch of 619 Montgomery Street, next door to and north of 611 Montgomery Street. His head and right shoulder could be seen from the defendant's position. Officer Murphy positioned himself approximately eight feet behind Officer Jones at the southwest corner of the porch. A wooden partition separated the two officers.

Though it was not yet dawn, it was possible for the officers to see each other without the use of flashlights because there were street lights in the vicinity, and the light from them was reflected by the snow on the ground. Both officers had their radios on and, according to testimony at trial, "everybody in the general vicinity could hear . . ." them. Both Officer Jones and Officer Murphy heard arguing and gunfire from within the building of 611 Montgomery Street. At 4:30 a.m. they saw a silhouette in the second story window of 611 Montgomery Street and observed the window being smashed out.

Immediately afterwards, the two officers heard shots fired from the defendant's position. Jones heard the bullets whistle by his head, hit the pavement behind him, ricochet off the pavement, and break a piece of glass behind him. Murphy, who was stationed "a porch-width away" from Jones, did not hear any bullets pass by him, although he heard glass breaking somewhere behind him.

The Special Reaction Team (SRT) arrived and assumed control shortly thereafter. Lieutenant Robinson, the officer in charge of the SRT, assigned Officer Doherty to negotiate with the defendant and stationed Officer Lussier and Sergeant Alexacos of the SRT on the second floor of the house across the street from 611 Montgomery.

Doherty positioned himself on the side porch of 619 Montgomery Street and attempted to communicate with Guglielmo at 5:47 a.m. Doherty, with the aid of a bullhorn, tried to communicate with the defendant for thirty to forty minutes, but received no response. Doherty then left the porch, returned and resumed his efforts.

Between 6:00 and 6:30 a.m., the defendant and Doherty spoke. According to Officer Doherty, the defendant responded to his questions coherently and logically. At one point during the communication, the defendant asked to speak to a friend. When Doherty refused the defendant's request, a burst of gunfire erupted. Doherty asked the defendant to come out, saying that the situation was not yet serious, but Guglielmo replied that he knew he was already in over his head and refused.

At that time, Officer Putney was positioned at the southwest corner of a house at 619 Montgomery Street, said house being north of and adjacent to the house at 611 Montgomery where the defendant was located. Sergeant Doherty was positioned at the southeast area of the house at 619 Montgomery. The officers were approximately sixteen to twenty feet from each other. Officer Putney was using a mirror-ended periscope to observe the scene. At approximately 6:30 a.m., Guglielmo said he could see the officer with "the mirror," and within seconds he fired several rounds. At trial, Sergeant Doherty testified that, following the defendant's statement, shots were fired by the defendant in a "westerly" direction, which was towards Putney's location, and that he heard the shots hit the house. Doherty further testified that he was concerned about the safety of Officer Putney and that, almost immediately after the statement and the gunfire, told Officer Putney to move. Putney testified that the impact of the 6:30 a.m. shots "appeared to be much closer to [him] than . . . to Sergeant Doherty [because they were] much louder . . . on impact."

Officer Doherty testified that at 7:00 a.m. the defendant stated that he knew Doherty's location. Rounds were fired at Doherty's location within minutes of the defendant's statement. A bullet struck a pole three to four feet directly behind Doherty, and several hit the side of the house within three to four feet of him.

During this time, Officers Lussier (sniper) and Alexacos (observer) had been stationed on the second floor of the house directly across from the defendant's location. At approximately 8:20 a.m. the defendant said to "get the snipers out of here." About four minutes later, two shots were fired which struck the third-floor window, six to eight feet above and north of the second-floor room

244

where the officers were located. Neither officer saw the defendant fire the shots.

At about 9:00 a.m., the defendant came out of the house, his weapon slung around him and a beer in one hand. He had no difficulty walking and responded appropriately, though slowly, to the order by the police to stop and kneel. The arresting officers testified that he did not appear intoxicated. As the defendant was led away, he told a friend that he left the house because he had run out of ammunition. He also told his friend that he had been taking drugs.

At the police station, the defendant registered a blood alcohol content of .15. When the police searched 611 Mongomery Street they found a .22 caliber derringer, bullet holes in various interior walls, spent nine millimeter shells, an empty fifth of vodka, an empty twelve-ounce beer can, and several empty paper packets commonly used to store cocaine, one of which was tested and found to have contained cocaine. The defendant claimed that he could not remember most of the events of the evening due to his intoxicated state.

The defendant was found guilty of attempted first-degree assault of Officers Jones, Doherty, and Putney. Attempt is defined in the following way:

> "A person is guilty of an attempt to commit a crime if, with a purpose that a crime be committed, he does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step towards the commission of the crime."

RSA 629:1. First-degree assault is defined by RSA 631:1, II as "[p]urposely or knowingly caus[ing] bodily injury to another by means of a deadly weapon." "A person acts purposely with respect to a material element of an offense when his conscious object is to cause the result or engage in the conduct that comprises the element." RSA 626:2, II(a). "A person acts knowingly with respect to conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II(b).

■ On appeal, "the defendant has the burden to demonstrate that no rational trier of fact, viewing the evidence most favorably to the State, could have found guilt beyond a reasonable doubt." *State v. Murray*, 129 N.H. 645, 650, 531 A.2d 323, 325 (1987); *State v. Smith*, 127 N.H. 433, 436, 503 A.2d 774, 776 (1985); *accord State v. Meloon*, 124 N.H. 257, 259, 469 A.2d 1316, 1318 (1983).

■ As a general rule, reviewing courts should defer to the jury's determination unless no reasonable person could have come to that conclusion. *See Smith, supra* at 437, 503 A.2d at 776. After all, "[t]he essence of a jury's function is to determine the weight and credence to be given the evidence at trial." *State v. Meany*, 129 N.H. 448, 451, 529 A.2d 384, 386 (1987); *State v. Sands*, 123 N.H. 570, 590, 467 A.2d 202, 214 (1983). As we noted in *Meany supra*, the jury is free to accept or reject the evidence presented to it. *Accord State v. Thresher*, 122 N.H. 63, 71, 422 A.2d 578, 582 (1982); *State v. Rullo*, 120 N.H. 149, 412 A.2d 1009 (1982); *Smith, supra* at 437, 503 A.2d at 776 (the weight given to testimony at trial depends on the credibility of the witnesses as determined by the jury).

■ The rational trier of fact is entitled to infer guilt from circumstantial evidence that excludes all other rational conclusions. *See State v. Danskin*, 122 N.H. 817, 818, 451 A.2d 396, 397 (1982); *State v. Wong*, 125 N.H. 610, 624, 486 A.2d 262, 271 (1984); *State v. Cyr*, 122 N.H. 1155, 1160, 453 A.2d 1315, 1318 (1982). Before addressing the defendant's contention that the evidence concerning Jones, Putney and Doherty was insufficient to prove a mental state greater than recklessness, we will address the defendant's contention that the facts of the 4:30 a.m. shooting involving Officer Murphy, on the one hand, and Officer Jones, on the other, were indistinguishable and that there is therefore no rational basis upon which to reconcile the Jones attempted assault conviction, requiring a purposeful or knowing state of mind, and the trial judge's granting the defendant's motion to reduce the charge with respect to Officer Murphy to reckless conduct. Quite to the contrary, the transcript shows us that the facts relating to Jones were distinguishable from those relating to Murphy and could rationally lead to different conclusions.

■ As mentioned above, Murphy and Jones were positioned approximately a "porch-width" away from each other, Officer Murphy behind Officer Jones. Officer Jones' right shoulder and head could be seen from the defendant's position, whereas Officer Murphy could not be readily seen. Officer Jones heard the shots pass by his head but Officer Murphy did not. From these facts, a jury could reasonably infer that at 4:30 a.m. the defendant kept looking out the second-floor window of 611 Montgomery; that there were street lights in the vicinity, snow on the ground reflecting the light and police radios audible in the general vicinity; that Jones was closer to the defendant's location and, unlike Murphy, his head

and shoulders were on occasion exposed to the second-floor window of 611 Montgomery; and that the defendant stood by the window, smashed it out and immediately fired shots that whistled by Jones' head. The jury could thus infer that there was intent to shoot one officer and not the other. The location of the shots is a most persuasive indicator of the shooter's intent to injure or kill. We hold, therefore, that the trial court did not err in denying the defendant's motion to set aside the Jones conviction.

■■ The evidence concerning Officer Putney and Sergeant Doherty is likewise sufficient to support the attempted first-degree assault convictions. The jury could reasonably have concluded that the defendant did indeed see Sergeant Doherty and within minutes fired several rounds in his direction, a bullet striking a pole three to four feet behind him. The jury also could reasonably have concluded that the defendant had intended to fire at Officer Putney because the defendant knew where Officer Putney was located, and because of the trial testimony concerning both the immediacy of the shots, following the defendant's statement regarding Putney's location, and the direction of the shots. "Conduct illuminates intent." *State v. Wills*, 107 N.H. 107, 109, 218 A.2d 47, 48 (1966); *accord Meany supra.*

Finally, the defendant contends that his intoxication precluded him from forming the state of mind required by RSA 626:2, II(2)(b), and that he therefore could not have been found guilty of attempted first-degree assault.

■ "Intoxication is not, as such, a defense. The defendant may, however, introduce evidence of intoxication whenever it is relevant to negate an element of the offense charged . . . ." RSA 626:4; *see State v. Noel*, 119 N.H. 522, 528, 404 A.2d 290, 293 (1979). But "[i]t is for the jury to resolve whether intoxication negates the element of intent." *State v. Goodwin*, 118 N.H. 862, 867, 395 A.2d 1234, 1237 (1978); *accord Noel, supra* at 528, 404 A.2d at 293; *State v. Warren*, 114 N.H. 196, 317 A.2d 566 (1974).

■ There was testimony that the defendant had been drinking and taking drugs that evening. Nonetheless, the record shows compelling countervailing evidence to support the jury's conclusion that the defendant was capable of acting purposely. The defendant responded coherently and logically during negotiations with Officer Doherty. He was able to provide family information to Doherty. He was aware of the seriousness of the situation when he told Officer Doherty during negotiations that he would "get ten years for shooting at the cops." The defendant was able to respond coherently

and logically to police officer commands at the time of his surrender. He shot at Putney and Doherty, and in the direction of Lussier and Alexacos soon after telling Doherty he knew where each was located. Finally, the transcript shows that the defendant said that he would "kill them all" when he learned of the police officers' presence.

 "It is the jury's function to hear testimony, observe witnesses and judge their credibility; it is not bound by the evidence and may accept or reject the evidence in whole or in part." *State v. Chapin*, 128 N.H. 355, 357, 513 A.2d 358, 359 (1986). The evidence in this case, viewed in the light most favorable to the State, appears ample to support the proposition that a reasonable jury could have found that the defendant acted purposely, and accordingly it was not error for the trial court to deny the defendant's motions to dismiss or to reduce to reckless conduct the charges involving Officers Jones, Putney and Doherty.

*Affirmed.*

All concurred.