Hillsborough
No. 88-221

THE STATE OF NEW HAMPSHIRE

v.

ROBERT J. BROWN

November 13, 1989

*Stephen E. Merrill,* attorney general (*Andrew W. Serell,* senior assistant attorney general, on the brief, and *Tina Schneider,* assistant attorney general, orally), for the State.

*Joseph C. Krolikowski Legal Professional Association,* of Nashua (*Joseph C. Krolikowski* on the brief and orally), for the defendant.

THAYER, J.   The defendant, Robert J. Brown, was indicted on three counts for being an accomplice to receiving stolen property, RSA 637:7, and was convicted on one of the counts after a jury trial in the Superior Court (*Pappagianis*, J.). On appeal, the defendant argues (1) that there was insufficient evidence as a matter of law for the jury to have found that the defendant was guilty on December 3, 1986; (2) that the trial court erred in denying his motion for directed verdict because there was insufficient evidence for the jury to have found that he knew or believed that the property had probably been stolen on December 3, 1986; (3) that the trial court erroneously denied his motion to set aside the verdict when neither the defendant nor the State's expert could have ascertained, based on the evidence presented, that the property had been stolen; and (4) that the trial court erred in denying his motion for judgment notwithstanding the verdict after the jury returned inconsistent verdicts. For the reasons that follow, we affirm the conviction.

Lawrence Paro operated General Machine and Foundry in Wilton, a business which made permanent mold aluminum castings by pouring molten aluminum into molds. In the course of his business, Paro purchased different types of aluminum alloy from distributors in the form of thirty-five-pound bars, or ingots, which were stored in an underground area. Each bar was stamped with a serial number, indicating the type of alloy in that bar.

On October 27, 1986, Paro reported to the New Hampshire State Police that 4,548 pounds, in the form of 2 pallets, of Number 356 alloy aluminum worth over $3,000 was missing. On November 20, 1986, an additional 2,780 pounds of alloy worth over $2,500 was stolen, including one bundle of Number 356 and one bundle of Number 208. Then, on December 2, 1986, a third theft occurred in which 2,700 pounds of aluminum was stolen, 1,350 pounds of Number 356 and 1,400 pounds of Number 850, which together were worth over $3,000.

After the third theft was reported, the State Police began checking the various scrap metal yards in both New Hampshire and Massachusetts for the missing aluminum. On December 4, 1986, the police spoke with Robert Betty, the owner of Alco Scrap Metal Yard in Lowell, Massachusetts. Betty indicated that the same quantity of aluminum that the police had described as stolen had recently been sold to Betty by the defendant, Robert J. Brown. Subsequently, Paro identified the aluminum in Betty's scrap yard as the aluminum which was stolen from him.

Betty testified that he was in the business of purchasing scrap metal, usually from sheet metal machine shops, for resale. He was acquainted with the defendant because Brown had worked for another metals company with which Betty had done business in the past. In October of 1986, Brown called Betty and offered to sell him some scrap aluminum which he represented as alloy 6061, an alluminum alloy in extrusion form. Extrusion aluminum is generally poured for a specific job, and not being readily reusable, it is usually discarded for scrap.

Betty purchased 3,054 pounds of what Brown told him was extrusion aluminum on October 23, 1986, and another 3,244 pounds of what Brown represented as extrusion aluminum on November 20, 1986. Prior to the second transaction, Betty did not have an opportunity to personally view the aluminum he had purchased from Brown. After Brown delivered the second load, however, Betty realized after looking at what he had bought that the aluminum was not 6061 extrusion, but various types of casting alloys. As Betty testified, casting alloys are usually remelted in a foundry and used as is, with the result that they are rarely discarded and sold as scrap.

On December 3, 1986, Brown drove down to Betty's metal yard once more to sell Betty a third truckload of alleged extrusion aluminum. At this time, Betty pointed out to Brown that the aluminum bars Brown had sold to him in October and November, which had numbers stamped on them, were not extrusion, but various casting alloys. Because of the large quantities of the alloys, and the fact that casting alloys are not generally sold as scrap, Betty told Brown that "there was a distinct possibility they might be stolen." Brown assured Betty that the aluminum had not been stolen, but told Betty that the delivery that day would be his last. After purchasing the final delivery of aluminum, which included 2,244 pounds of what he now knew to be new castings, Betty did not hear from Brown again.

The defendant's testimony indicates that he was approached by a Mr. Dobens in October, 1986, and was asked whether Brown could help him get a good price for some aluminum Dobens wanted to sell. Brown testified that at this point he asked whether the aluminum was stolen, and was told that it was not. After receiving this assurance, Brown proceeded to help Dobens and another two men transport the materials down to Lowell in October, November, and December, to sell to Betty as scrap.

Whether or not Brown knew that the aluminum was casting alloy, or that it was stolen, and the degree to which Brown participated in transporting the materials and sharing in the profits from the sales, are all subject to conflicting testimony. For example, Brown claimed that the first time he went to Lowell to sell Betty the aluminum, he did not assist in transporting the materials. However, one of Betty's laborers named Banacos testified that the aluminum was unloaded from the vehicle owned and driven by Brown, a Blazer-type truck. Later, Brown claimed he never saw the third load of aluminum that he sold to Betty on December 3, 1986. However, Banacos testified that not only were the aluminum bars transported in the same Blazer-type vehicle driven by Brown, but also that Brown had helped unload the third delivery of bars.

The defendant, who had been involved in the metals business for over twenty years, testified that he was unfamiliar with different types of aluminum, and could not distinguish a casting alloy from extrusion aluminum merely by looking at it. Betty, on the other hand, testified that when he first saw the aluminum he had purchased from Brown, he knew immediately after looking at the markings that the aluminum was a casting alloy, and not 6061 extrusion aluminum. Additionally, Betty testified that Brown appeared to be experienced in metals and generally knew what was being sold.

After the New Hampshire State Police located the alloys that Paro had reported missing, Officer Forsaith questioned the defendant. Brown admitted selling the aluminum to Robert Betty, and he gave a written statement to the police describing the extent of his involvement. In his statement, Brown indicated that he had only made two trips to Betty's scrap yard. The defendant also stated that out of the money Betty had paid for the aluminum, Brown was given only $50–$100 after the first trip down to Lowell, and nothing after the second trip. However, according to other witnesses and his own in-court testimony, Brown made three trips, not just two, to Betty's scrap yard. Furthermore, the police later learned, after questioning Dobens, that Brown had lied when he had stated he was paid only after the first delivery was made to Lowell. In truth, as Dobens told the police and as Brown later admitted in court, the defendant was paid $50 after both the first and second loads of aluminum were delivered. Moreover, although Brown assured Betty that the aluminum had not been stolen, when the police asked the defendant whether he knew that the bars were stolen, the defendant "just kind of looked at [them] and smiled." This non-

verbal response led the police to believe that Brown knew the aluminum was stolen at the time he sold it to Betty.

In addition to the inconsistencies among witnesses about the extent of Brown's involvement in each of the three deliveries, there are internal inconsistencies within Brown's own testimony which warrant discussion. For instance, although the defendant repeatedly stated that he never saw the aluminum that was sold to Betty, when asked how he knew the type of metal he was selling, the defendant answered, "I just assumed by looking at it." On another occasion, when asked why he had told Betty he had extrusion, or new aluminum to sell, as opposed to another type of aluminum, the defendant initially answered, "I classify new aluminum as looking at anything that looks like it's new." However, later in his testimony, when asked a similar question, Brown responded that he classified the metal as new aluminum because he had seen "new aluminum" written on a business slip from another metals company quoting the price they would have paid for the same metal sold to Betty.

■■■ The defendant first argues that based on the evidence presented at trial, which was essentially the same for all three counts, no rational finder of fact could have found that on December 3, 1986, the defendant knew or probably knew that the aluminum bars were stolen. The State correctly notes that the defendant carries the burden on appeal to prove that no rational fact-finder could have found the defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the State. *State v. Guglielmo*, 130 N.H. 240, 244, 544 A.2d 25, 28 (1987); *State v. Hopps*, 123 N.H. 541, 544, 465 A.2d 1206, 1208 (1983). Although the State is rarely able to prove by direct evidence that a defendant accused of receiving stolen property possessed the requisite guilty knowledge, the State may prove this essential element "by any surrounding facts or circumstances from which such knowledge may be inferred." *State v. Cote*, 113 N.H. 647, 650, 312 A.2d 687, 689 (1973) (quoting 66 AM. JUR. 2d, *Receiving Stolen Property* § 25, at 313); see *State v. Guglielmo*, 130 N.H. at 245, 544 A.2d at 28 (rational fact-finder may infer guilt from circumstantial evidence excluding all other rational conclusions).

We hold that the evidence presented at trial was sufficient for a rational fact-finder to have found that the defendant knew or probably knew on December 3, 1986, that the aluminum bars were stolen. Initially, a fact-finder could reasonably have found that the defendant knew the aluminum sold on December 3 was stolen, based on the nature and quantity of aluminum delivered. Brown

delivered and sold to Betty a total of over 8,000 pounds of a type of aluminum rarely discarded as scrap. Although it could have been determined that the defendant was not aware of the type of aluminum he sold to Betty in October and November, a fact-finder would be justified in finding that after Betty alerted him in December of the type of aluminum he had previously delivered, Brown knew or believed at the time of the third sale that the aluminum was probably stolen. Additionally, since casting alloys are generally remelted in a foundry and used as is, the large quantities of casting alloys that Brown sold Betty as scrap were evidence that Brown knew or probably knew the aluminum was stolen.

Second, when Brown went down to Lowell on December 3 to make his third sale to Betty, Brown did not disclose that this delivery would be his last until immediately after Betty indicated to the defendant that the alloys may have been stolen. We find that the defendant's apparent decision to discontinue further deliveries immediately after being confronted with Betty's suspicions was sufficient evidence for a fact-finder to have found that Brown knew the aluminum he sold on December 3 was stolen.

Third, although the defendant repeatedly denied ever knowing that the aluminum was stolen, when the police asked whether he knew the material had been stolen, the defendant did not answer. Instead, the defendant just smiled. The defendant's failure to deny knowing that the aluminum was stolen, coupled with his smile in response to the question, was evidence a fact-finder could have regarded as an implied admission of guilty knowledge.

Finally, the defendant's in-court testimony was contradictory regarding the extent to which he participated in transporting the aluminum and shared in the profits from its sale, and his reasons for characterizing the metal as extrusion aluminum. Based on these inconsistencies, the jury could have found that the defendant knew by the time of the final delivery that the aluminum was in fact stolen. *See State v. Murray*, 129 N.H. 645, 650–51, 531 A.2d 323, 327 (1987) (jury may infer guilt from inconsistencies and contradictions in defendant's statements and testimony). We hold that, viewing the evidence discussed above in the light most favorable to the State, a rational fact-finder could have concluded beyond a reasonable doubt that the defendant knew or probably knew that the aluminum he sold on December 3, 1986, was stolen.

■ The defendant next argues that the trial court erred in denying his motion for directed verdict at the close of the State's case, because the State failed to prove that the defendant knew or believed on December 3, 1986, that the aluminum was probably stolen. On appeal, the defendant carries the burden of proving that the evidence and all reasonable inferences therefrom, construed in the light most favorable to the State, was insufficient for a rational trier of fact to have found beyond a reasonable doubt that the defendant was guilty of the crime charged. *State v. Casey*, 113 N.H. 19, 19, 300 A.2d 325, 326 (1976); *State v. Dupuy*, 118 N.H. 848, 850, 395 A.2d 851, 852 (1978). We held above that the evidence introduced during trial was sufficient for a fact-finder to have found that the defendant knew or believed on December 3, 1986, that the aluminum was probably stolen. With the exception of the defendant's contradictory in-court testimony, all of the evidence that we reviewed above was introduced during the State's case-in-chief. We hold that viewing this evidence in the light most favorable to the State, without considering the defendant's testimony, a rational trier of fact could have found beyond a reasonable doubt that the defendant knew or probably knew that the aluminum he sold on December 3 was stolen. Therefore, the trial court did not err in denying the defendant's motion for directed verdict.

■ The third argument set forth by the defendant, that the trial court erroneously failed to set aside the verdict when neither the defendant nor the State's expert could have ascertained that the aluminum had been stolen, likewise has no merit. Initially, the State did not introduce any expert testimony into evidence at trial. Moreover, even if the State had qualified Betty as an expert, a fact-finder would not then be required to find that simply because Betty was unable to determine whether or not the aluminum had been stolen, the defendant likewise did not know that the aluminum had been stolen. *See Gordon v. Gordon*, 117 N.H. 862, 865, 379 A.2d 810, 813 (1977) (trier of fact may accept or reject testimony of any witness or party).

■ The defendant's final argument on this appeal is that the jury's verdict that the defendant was guilty of being an accomplice to receiving stolen property on December 3 is inconsistent with its simultaneous verdicts that he was not guilty of committing the same offense on October 23 or November 20. The defendant asserts that if the jury's verdicts cannot be reconciled on a rational basis, his conviction must be reversed. However, under federal and State law, the inconsistency of simultaneous jury verdicts against a single

defendant on a multiple-count criminal indictment need not be rationally reconciled, and does not entitle the defendant to relief. The case of *State v. Chapin*, 128 N.H. 355, 513 A.2d 358 (1986) does not hold to the contrary.

The United States Supreme Court held in 1932 that consistency among multiple-count verdicts is not necessary. *Dunn v. United States*, 284 U.S. 390, 393 (1932). Instead, the Court stated that although inconsistent verdicts may show that the jury did not voice its true conclusions in either the acquittal or the conviction, this does not mean that the jury was not convinced of the defendant's guilt. *Id.* The rationale supporting the Court's decision fifty-seven years ago has been expanded and continues to be relied upon today. *See United States v. Powell*, 469 U.S. 57, 62–69 (1984).

As *Powell* explains, even if inconsistent verdicts reflect jury error, it should not be assumed that they necessarily aid the government. It is just as likely that the jury correctly reached the guilty verdict on one count, and through leniency or mistake arrived at the not guilty verdict on a different count of the same offense. *Id.* at 65. Under these circumstances, the government is prevented by the United States Constitution's double jeopardy clause from appealing an acquittal based upon jury error. *Id.* The defendant, however, is in a superior position to determine whether the jury irrationally or erroneously arrived at its guilty finding, because he or she can appeal the verdict based on insufficient evidence. *Id.* at 67. If the appellate court concludes that sufficient evidence was introduced at trial to support a determination of guilt beyond a reasonable doubt, the conviction will stand. *Id.* Before a court could determine which of two or more inconsistent verdicts, if any, was based on error, mistake, or leniency, it would be necessary to inquire into the jury's deliberations. According to *Powell*, the better rule is to "insulate jury verdicts from review" under these circumstances. *United States v. Powell*, 469 U.S. at 68–69; *see* Fed. R. Ev. 606(b) (jurors incompetent to testify concerning jury deliberations); *see also Harris v. Rivera*, 454 U.S. 339, 345–46 (1981) (jury has unreviewable authority to return guilty verdict for impermissible reasons).

■ This court has recently noted, similar to the United States Supreme Court in *Dunn* and *Powell*, that

"[a]lthough it may be assumed that one of the two inconsistent verdicts is wrong, their inconsistency does not, standing alone, indicate where the error lies. If we were to vacate each verdict, one of our decisions would presum-

ably be wrong on the merits. If we were to vacate only one, we would never know which one to choose."

*Daigle v. Portsmouth,* 129 N.H. 561, 576, 534 A.2d 689, 697 (1987) (citations omitted). Moreover, a jury's verdict may not be impeached by the jurors' testimonies in this State. *Eichel v. Payeur,* 106 N.H. 484, 486, 214 A.2d 116, 118 (1965).

This court in 1978 set forth a jury instruction which allows a jury to find a criminal defendant not guilty even if the prosecution has proven all the elements of the offense charged beyond a reasonable doubt. *State v. Wentworth,* 118 N.H. 832, 838–39, 395 A.2d 858, 862–63 (1978); *see State v. Sands,* 123 N.H. 570, 590, 467 A.2d 202, 214 (1983) (jury not bound by evidence, but can accept or reject evidence in whole or in part). The trial court instructed the jurors in this case that they "should find Mr. Brown guilty" if they decided that the State proved all the elements of the crime, not that they must find him guilty if the prosecution proved each element of the offense. Therefore, since the jury is permitted in all cases to nullify a finding, and since courts are unable to determine which verdict, if any, was rendered erroneously, the fact that verdicts appear to be rationally inconsistent is an insufficient reason to reverse a guilty verdict. For these reasons, the defendant's final argument must also fail.

*Affirmed*

BROCK, C.J., did not sit; the others concurred.