NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough-northern judicial district
No. 2016-0118

THE STATE OF NEW HAMPSHIRE

v.

FELIX RUIZ

Argued: October 19, 2017
Opinion Issued: January 31, 2018

Ann M. Rice, deputy attorney general (Susan P. McGinnis, senior assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

DALIANIS, C.J. The defendant, Felix Ruiz, appeals his conviction by a jury of misdemeanor receipt of stolen property; namely, a United States passport belonging to an African-American woman named "Cecilia Francis Riley." See RSA 637:7 (2016). On appeal, he argues that the Superior Court (Smukler, J.) erred when it: (1) denied his motion to suppress certain evidence, including his post-Miranda confession, see Miranda v. Arizona, 384 U.S. 436 (1966); and (2) denied his motion to dismiss based upon insufficiency of the evidence. We affirm.

I.  Facts

We accept the trial court's findings where supported by the record of the suppression hearing.  State v. Morrill, 169 N.H. 709, 711 (2017).  For the purpose of determining the sufficiency of the evidence, we also consider facts adduced at trial that support the jury's verdict.  See id. at 711-12.

In May 2015, the defendant accompanied Juan Manuel Soto Guzman to the Manchester office of the State Division of Motor Vehicles (DMV) so that Guzman could obtain a New Hampshire driver's license under the name "Angel Berrios Rivera."  The defendant knew Guzman and was aware that Guzman is not, in fact, "Angel Berrios Rivera."

Before accompanying Guzman to the Manchester DMV, the defendant performed what he called a "background" on "the Angel Berrios Rivera identity," and provided the information he collected about that identity to Guzman in exchange for money.  The defendant then drove Guzman to the Manchester DMV and filled out the driver's license application in the "Angel Berrios Rivera" name for Guzman.  Among the documents that the defendant submitted with Guzman's application were:  (1) a social security card in the "Angel Berrios Rivera" name; (2) a birth certificate for "Angel Berrios Rivera"; and (3) a lease agreement between "Angel Berrios Rivera" and a landlord.  With respect to the lease agreement, the defendant signed it on behalf of the "landlord" and gave his own cellular telephone number as the landlord's telephone number.  The defendant said that he knew that "the real Angel Rivera . . . was not aware that [the defendant] had collected his information and had utilized it . . . at the DMV."  According to the defendant, he is part of a "whole process of obtaining documents and assisting" others in obtaining "false identities."

After Guzman's driver's license application had been submitted, State Troopers Dupont and O'Leary were dispatched to the Manchester DMV because the submitted documents appeared to be fraudulent.  Guzman and the defendant were asked if they would speak to the troopers, and both men agreed to do so.  The two men were separated.  O'Leary spoke with Guzman.  Dupont spoke with the defendant in a room that was 10 feet by 10 feet square and contained a desk and a chair.  Dupont sat behind the desk, leaving the room's door open.  Periodically, Dupont left the room to consult with O'Leary.

Once Dupont identified himself to the defendant, the defendant asked, "out of the blue," whether "there [was] anything wrong with the documents."  Dupont "thought it was an odd question" because "up to [that] point, [he] had believed that [the defendant] was simply there . . . to assist . . . Guzman" in obtaining a driver's license.

2

Dupont began by inquiring, generally, about who the defendant was, why he was there, and how he knew the other man (Guzman). Initially, the defendant claimed that he did not know the other man and that he was at the DMV only to act as a translator. Eventually, he admitted to knowing the other man's father. Finally, he conceded that he had known the other man for two weeks.

The defendant told Dupont that he had traveled from his home in Hyde Park, Massachusetts, had picked up the other man at the Manchester address listed on the driver's license application and taken him to the Manchester DMV, and that the defendant was not being paid for his services. He also told Dupont that he had not given the other man any documents to be submitted with the driver's license application.

The police contacted Immigration and Customs Enforcement (ICE). When an ICE agent arrived at the DMV to fingerprint Guzman, Dupont asked the defendant if he would be willing to be fingerprinted, and the defendant agreed. When Guzman was fingerprinted, his true identity was revealed. Guzman was then taken into custody.

Before leaving the DMV, Guzman voluntarily showed O'Leary text messages that he had exchanged with the defendant to arrange their meeting and to agree to a $350 fee for the defendant's services. After he was confronted with the messages, the defendant admitted to signing the lease agreement for Guzman.

At that time, which was approximately two and one-half hours after the interview began, the police arrested the defendant for conspiracy. He was then advised of his <u>Miranda</u> rights. <u>See</u> <u>Miranda</u>, 384 U.S. at 479. Dupont read each right to the defendant, after which he asked the defendant whether he understood his rights and would agree to waive them. The defendant agreed to waive his rights and initialed and signed the form. He then wrote a statement in which he claimed that Guzman, to whom he referred as "Angel," had paid him $25 for translation services and $25 for gas in exchange for assisting him with the driver's license application. He denied signing the lease agreement, but admitted that he gave his cellular telephone number as the landlord's number at "Angel's" request. When Dupont pointed out that the defendant had just confessed to signing the lease, the defendant wrote on the back of the statement that he had, indeed, signed the lease. The defendant signed both the front and back of the statement.

Upon further questioning, the defendant admitted that Guzman was not, in fact, "Angel," that he had provided Guzman with documents related to the "Angel Berrios Rivera" identity in order to help Guzman obtain "another identity," and that he and others from Massachusetts were part of a "whole process of obtaining documents and assisting" individuals to procure "false

3

identities." The defendant told Dupont that he was paid to perform "backgrounds" on individuals and that the information he obtained was then given to someone else who would generate the false identity documents. As part of the "background" that he did on the "Angel Berrios Rivera" identity, the defendant looked for names "to try and consolidate the name and date of birth and the Social Security number" associated with that identity.

During the entire interview, the defendant was "extremely cooperative" with and "polite" to the troopers. As a result, Dupont offered to release him provided that he produce the minimum amount of cash bail for a misdemeanor charge. The defendant had no cash available, but claimed that his girlfriend could bring it. The troopers allowed him to text his girlfriend, who agreed to come to the DMV with the money. However, the girlfriend never arrived and, after a few hours of waiting, the police decided to transport the defendant to jail and allow his girlfriend to meet him there.

Before being escorted to jail, the defendant expressed concern about leaving his girlfriend's purse visible in his vehicle. The defendant agreed to allow Dupont to hide the purse and gave him the keys to his vehicle.

Dupont did not see the purse on the driver's side of the passenger compartment, and, thus, entered the vehicle to see if it was located elsewhere. He observed the following items on the floor between the driver and passenger seats: (1) a two-part lease agreement that appeared to be similar to the form that had been submitted with Guzman's driver's license application; (2) a white envelope on which were written the word "Junior," the signature of "Angel Berrios Rivera," and the number "25"; and (3) a document detailing an on-line search of a social security number for "Angel Berrios Rivera." Believing the documents to be contraband related to Guzman's attempt to obtain a driver's license and fearing that the defendant's girlfriend would destroy or remove them, Dupont seized them. Upon exiting the vehicle, Dupont saw a small purse, which he hid, as the defendant had requested.

Thereafter, without showing the defendant the documents or informing the defendant about what he had observed, Dupont asked the defendant if he would consent to a search of his vehicle. The defendant readily agreed, signing a handwritten consent form that Dupont drafted. Dupont conducted a full search of the vehicle, during which he found a black bag containing, among other items, the passport at issue in this case.

Dupont then showed the defendant the Miranda form again and asked him if he recalled his rights and that he had waived them. The defendant said that he did, and the two troopers questioned him about the documents found in his vehicle. The defendant told Dupont that "he had been cleaning [Riley's] house because she was deceased, and the [landlord] that had hired him told him that if he found anything he wanted, he could keep it," so "when he came

4

across the passport, . . . he just kept it." The defendant did not explain to Dupont why he retained the passport.

In a search of the defendant's person incident to his arrest, Dupont found inside the defendant's wallet a medical card in the name of "Juan Pena." The defendant gave no reason as to why he had that card in his possession.

## II. Motion to Suppress

### A. Relevant Procedural Facts

Before trial, the defendant moved to suppress his statements and the documents found in his vehicle on the ground that they were obtained in violation of his <u>Miranda</u> rights. The trial court partially granted and partially denied his motion.

With respect to the statements the defendant made before being advised of his <u>Miranda</u> rights, the trial court determined that the statements he made before being fingerprinted were admissible because, before then, the defendant had not been subject to custodial interrogation. The court observed that the door to the interview room was left open and that Dupont did not block the exit. Moreover, the court found that, although Dupont was armed, he never drew his weapon or physically restrained the defendant. Further, the tone of the interview was polite throughout. Additionally, the duration of that portion of the interview (two and one-half hours) was not excessive.

The court determined that the fingerprinting of the defendant "fundamentally shifted the nature of the interview" because it resulted in Guzman's arrest and allowed O'Leary to join Dupont in questioning the defendant. At that point, the trial court found, the interview constituted custodial interrogation. Thus, the court suppressed the defendant's initial admission to signing the lease agreement because he made it before having been warned of his <u>Miranda</u> rights.

With respect to the statements the defendant made after he was advised of his <u>Miranda</u> rights, the court found that the defendant's waiver of those rights was knowing, intelligent, and voluntary. The court also determined that, considering the totality of the circumstances, the defendant's post-<u>Miranda</u> confession was voluntarily given. Accordingly, the court did not suppress any of the defendant's post-<u>Miranda</u> statements.

With respect to the documents found in the defendant's vehicle, the trial court determined that: (1) Dupont was lawfully in the vehicle when he inadvertently observed the documents; (2) Dupont lawfully seized the documents; and (3) because Dupont's initial seizure of the documents was lawful, the defendant's subsequent consent to search, the additional

documents retrieved from his vehicle, and his subsequent statements did not constitute the "fruit of the poisonous tree." The court also found that the defendant's consent to search his vehicle was voluntary. Based upon those findings, the court declined to suppress the evidence obtained from the defendant's vehicle.

### B. The Defendant's Appellate Arguments

The defendant argues that the trial court erred when it determined that his post-<u>Miranda</u> confession was voluntary. When reviewing a trial court's order on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review the court's legal conclusions <u>de novo</u>. <u>Morrill</u>, 169 N.H. at 715.

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. <u>State v. Ball</u>, 124 N.H. 226, 231-33 (1983). Our State Constitution requires the State to prove, beyond a reasonable doubt, that a defendant's confession is voluntary. <u>See</u> <u>State v. Fleetwood</u>, 149 N.H. 396, 402 (2003); <u>see</u> N.H. CONST. pt. I, art. 15. "To be voluntary, a confession must be the product of an essentially free and unconstrained choice and not be extracted by threats, violence, direct or implied promises of any sort, or by the exertion of any improper influence or coercion." <u>Fleetwood</u>, 149 N.H. at 402-03 (quotation omitted). "Whether a confession is voluntary is initially a question of fact for the trial court, whose decision will not be overturned unless it is contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State." <u>Id</u>. at 402 (quotation omitted).

When, as in this case, the defendant's post-<u>Miranda</u> confession is preceded by an earlier voluntary confession that violated his <u>Miranda</u> rights, we consider the following factors to determine whether the "lesser taint of a <u>Miranda</u> violation" was dissipated: (1) the time lapse between the initial confession and the subsequent statements; (2) the defendant's contacts, if any, with friends or family members during that period of time; (3) the degree of police influence exerted over the defendant; (4) whether the defendant was advised that his prior admission could not be used against him; and (5) whether the defendant was advised that his prior admission could be used against him. <u>Id</u>. at 405-06. No single factor is dispositive. <u>See</u> <u>id</u>. at 406.

Although the defendant purports to challenge the validity of his <u>Miranda</u> waiver, as the State suggests, he does not develop that argument sufficiently for judicial review. <u>See</u> <u>State v. Blackmer</u>, 149 N.H. 47, 49 (2003). Rather, he merely asserts, without authority or further argument, that "[t]he court erred in finding that [his] <u>Miranda</u> waiver was voluntary." Consequently, we will not separately address the validity of the defendant's waiver of his <u>Miranda</u> rights. <u>See</u> <u>Fleetwood</u>, 149 N.H. at 406.

6

Viewing all of the circumstances surrounding the defendant's post-Miranda confession in the light most favorable to the State, we conclude that the trial court's finding that the post-Miranda confession was voluntary is not against the manifest weight of the evidence. See id. at 402. Here, there was no delay between the defendant's arrest and the giving of the required warnings. See id. at 407. As the defendant acknowledges in his appellate brief, once he was arrested for conspiracy, the police "immediately reviewed Miranda rights with [him]," and he "indicated his understanding of the rights and willingness to speak."

Nor was there evidence that the police made any promises, threats, or displays of force in an attempt to induce the defendant to confess. See id. at 406 (observing that the trial court found the defendant's confession to be voluntary, in part, because of "the absence of threats, violence or coercion of any kind and the absence of promises or undue influence"); see State v. Dellorfano, 128 N.H. 628, 636 (1986). Rather, according to the trial court, the interaction between the police and the defendant was, at all times, polite and relaxed. See Fleetwood, 149 N.H. at 406 (noting that the trial court found the defendant's confession to be voluntary based, in part, upon the "cordial tone of the interview" and "the defendant's calm tone of voice" (quotation omitted)). Although Dupont was armed, he never drew his weapon or physically restrained the defendant. Further, before confessing, the defendant never requested, and the police never denied him, contact with his family and friends. Indeed, when the subject of bail was broached, the police allowed the defendant to contact his girlfriend and to wait several hours for her to arrive.

Although, as the trial court found, "there was a minimal time lapse" between the defendant's unwarned confession and his post-Miranda confession, we do not consider this fact to be dispositive under the circumstances of this case. "[A] time lapse between the unwarned and warned confessions is not required for the subsequent confession to be voluntary." Id. at 407. However, as we have explained:

> [I]f a defendant has been arrested and is unquestionably in custody and entitled to Miranda warnings, a police decision to delay giving the required warnings and elicit a statement followed immediately by the warnings and another incriminating statement, strongly suggests that the police are exploiting the inherent pressures of custodial interrogation such that the post-Miranda statement should ordinarily be inadmissible.

Id. (citations omitted).

Here, there is no evidence of "a police decision to delay giving the required warnings," after the defendant was "unquestionably in custody and entitled to Miranda warnings." Id. Rather, as in Fleetwood, during the

7

interview that preceded the defendant's unwarned confession, his custody status was unclear.  See id.  He had not been arrested.  See id.  At most, he had been subject to investigatory detention.  He was interviewed in a room with the door open.  No officer blocked the exit from the room.  The officer, while armed, never drew his weapon or physically restrained the defendant.  The length of the interview was not excessive.  The questioning of the defendant was not accusatory.  The defendant's custody status did not become clear until he was arrested, and, at that time, he was immediately advised of his Miranda rights.

We also do not consider dispositive the fact that the police failed to advise the defendant that his unwarned confession could not be used against him in court.  See id. at 406.  "[I]t is impractical to require the police to determine the admissibility of an unwarned confession."  Id.  "This would require them to make legal determinations regarding whether there had been interrogation and custody."  Id.  Considering the relevant circumstances, viewed in the light most favorable to the State, we conclude that the trial court's finding that the post-Miranda confession was voluntary is not against the manifest weight of the evidence.  See id. at 402.

In arguing for a contrary result, the defendant relies upon the plurality opinion in Missouri v. Seibert, 542 U.S. 600 (2004).  "In Seibert, police employed a two-step strategy to reduce the effect of Miranda warnings:  A detective exhaustively questioned Seibert until she confessed to murder and then, after a 15- to 20-minute break, gave Seibert Miranda warnings and led her to repeat her prior confession."  Bobby v. Dixon, 565 U.S. 23, 30 (2011) (per curiam); see Seibert, 542 U.S. at 604-06, 616 (plurality opinion).  "The Court held that Seibert's second confession was inadmissible as evidence against her even though it was preceded by a Miranda warning."  Dixon, 565 U.S. at 30.

"A plurality of the Court reasoned that upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again."  Id. (quotation and brackets omitted); see Seibert, 542 U.S. at 613-15 (plurality opinion) (detailing a "series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object").

Justice Kennedy "concurred in the judgment, noting he would apply a narrower test applicable only in the infrequent case in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."  Dixon, 565 U.S. at 30-31 (quotation and ellipsis omitted); see Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  His narrower test controls under the Federal Constitution.  See Panetti v. Quarterman, 551 U.S.

930, 949 (2007) (explaining that "[w]hen there is no majority opinion, the narrower holding controls"); see United States v. Jackson, 608 F.3d 100, 103-04 & n.2 (1st Cir. 2010) (observing that some federal circuit courts of appeal have interpreted Justice Kennedy's vote as limiting the reach of Seibert).

Under the Federal Constitution, the defendant's reliance upon Seibert is misplaced as there is no evidence in this case that the police were following a "deliberate question-first, warn-later strategy." Dixon, 565 U.S. at 30 (quotation omitted). As the trial court found, at the time of the defendant's unwarned confession, the police had not decided to arrest him. There is no evidence "of any pre-planned evasion of Miranda." United States v. Jackson, 608 F.3d 100, 104 (1st Cir. 2010). We need not decide whether the State Constitution requires that we provide greater protection to criminal defendants than Justice Kennedy's narrower test because, even if such circumstances might exist in another case, they do not exist here.

Because the trial court's finding that the defendant's post-Miranda confession was voluntary is not against the manifest weight of the evidence, we hold that the trial court did not err when it denied his motion to suppress that confession. The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. See State v. Aubuchont, 141 N.H. 206, 208 (1996) (observing that the State Constitution provides greater protection to a criminal defendant with respect to confessions than does the Federal Constitution). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

The defendant next asserts that "all of the State's evidence flowed from [his] unwarned statements," and, thus, should have been suppressed as the fruit of that poisonous tree. We disagree.

This court, construing Part I, Article 15 of the State Constitution, has specifically interpreted the "fruit of the poisonous tree" doctrine to apply in the Miranda context, "holding that certain physical evidentiary fruits derived from a Miranda violation are inadmissible at trial." State v. Barkus, 152 N.H. 701, 706 (2005); see State v. Gravel, 135 N.H. 172, 180-84 (1991). "In Gravel, police elicited information from a defendant in violation of his Miranda rights, then used that information to procure a search warrant that ultimately yielded cocaine and related paraphernalia." Barkus, 152 N.H. at 706; see Gravel, 135 N.H. at 174-75. "Reversing the defendant's conviction for possession of cocaine, we concluded that because the search warrant was tainted by the Miranda violation, the subsequent search was illegal and all evidence seized thereby was inadmissible at trial." Barkus, 152 N.H. at 707; Gravel, 135 N.H. at 176. "Essential to our reasoning in Gravel was the fact that no act of free will on the defendant's part intervened between the primary illegality and the subsequent search." Barkus, 152 N.H. at 707.

In Barkus, the defendant voluntarily consented to a breath test after being advised of her statutory right to refuse.  Id.  Unlike the defendant in Gravel, the defendant in Barkus was given "the option of refusing to provide the physical evidence at issue."  Id.  "By electing to proceed with the test after being informed of her rights, the defendant engaged in an intervening act of her own free will."  Id.  Thus, in Barkus, we declined "to apply the Gravel 'fruit of the poisonous tree' doctrine."  Id.

We similarly decline to apply the Gravel "fruit of the poisonous tree" doctrine in this case.  First, we decline the defendant's implied invitation to expand that doctrine beyond physical evidence.  Second, the defendant in this case, similar to the defendant in Barkus, after having been informed of his rights, engaged in intervening acts of his own free will.  See id.  The defendant expressed concern about the purse in his vehicle long after he made the unwarned confession.  He did not express concern until after the police allowed him to text his girlfriend and to wait several hours for her to arrive at the Manchester DMV.  It was only after she failed to arrive and the police decided to take the defendant to jail that he expressed concern about the purse.

Moreover, the defendant voluntarily accepted Dupont's offer to enter the vehicle in order to hide the purse and voluntarily gave Dupont the keys to his vehicle.  Further, the defendant voluntarily consented to a full search of his vehicle.  Under these circumstances, we decline to apply the Gravel "fruit of the poisonous tree" doctrine to the physical evidence at issue in this case.

## III.  Sufficiency of the Evidence

### A.  Relevant Procedural Facts

At trial, after the State had rested, the defendant moved to dismiss on the ground that the State had "presented no evidence that [he] knew the passport was stolen or believed that it had probably been stolen" or that he "intended to deprive . . . Riley of [it]."  The defendant also asserted that the State had failed to prove that the passport belonged to someone other than him.  Specifically, his counsel argued:

> [T]he State has alleged that [the defendant] retained property belonging to [Cecilia Francis] Riley.  Ms. Riley did not testify at trial.  No evidence was presented to show that she was even alive.  And to the contrary, evidence was presented that [the defendant] at least believed her to be deceased.  No other individual who claimed to have a possessory interest in this property testified at trial.

The trial court denied the defendant's motion.  After the jury convicted him, the defendant unsuccessfully moved for reconsideration and/or to set aside the verdict.

10

B.  The Defendant's Appellate Arguments

The defendant argues that the trial court erred by denying his motion to dismiss based upon sufficiency of the evidence.  "A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo."  Morrill, 169 N.H. at 718 (quotation omitted).  To prevail upon his challenge to the sufficiency of the evidence, the defendant must demonstrate that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt.  Id.

To convict the defendant of receiving stolen property, the jury had to find, beyond a reasonable doubt, that he (1) received, retained, or disposed of the property of another (2) knowing that the property had been stolen, or believing that it had probably been stolen and that (3) he acted with the specific purpose to deprive the owner of the property.  RSA 637:7, I.

On appeal, the defendant argues, for the first time, that "[t]hese elements require the State to prove that the property was stolen."  He contends that the State's proof was insufficient because the State presented no evidence that his possession of the passport was illegal, such as "testimony from Riley's family that her passport had been stolen."  He argues that, absent such proof, "[a] rational conclusion from the evidence is that [his] possession of the passport was not illegal and, thus, that he did not know or believe the passport was probably stolen."

The defendant did not preserve this argument for our review.  "The general rule in this jurisdiction is that a contemporaneous and specific objection is required to preserve an issue for appellate review."  State v. Edic, 169 N.H. 580, 583 (2017) (quotation omitted). "This rule, which is based on common sense and judicial economy, recognizes that trial forums should have an opportunity to rule on issues and to correct errors before they are presented to the appellate court."  Id. (quotation omitted).

In the trial court, the defendant never argued that the evidence was insufficient because the State had failed to prove that the passport, in fact, had been stolen.  Rather, the defendant argued that the evidence was insufficient because the State had failed to prove that he possessed property belonging to another.  See State v. Pappas, 705 P.2d 1169, 1171-72 (Utah 1985) (citing cases and explaining the split between jurisdictions that require that the property actually be stolen and those that require only that the person receiving the property believe that it probably has been stolen).  He contended that the State's proof failed because no evidence had been presented that Riley was alive, "[n]o other individual who claimed to have a possessory interest in this property testified at trial," and "[t]he State presented no evidence that [she]

11

had an estate, that she had any relatives, that she had anyone who had a possessory interest" in the passport.

In considering the defendant's motion, the trial court observed that the State "presented evidence [that] the passport . . . was clearly not [the defendant's]," implying that such proof was sufficient. Consistent with that observation, the trial court did not instruct the jury that the State had to prove that the passport was, in fact, stolen. Rather, the court instructed the jury, without objection, that the State had to prove that "the Defendant received, retained, or disposed of the property of another person." Under these circumstances, we conclude that the defendant did not preserve his argument for our review.

Because the defendant has not preserved his argument for our review, we confine our review to plain error. See Sup. Ct. R. 16-A. The plain error rule allows us to consider errors that were not raised in the trial court. State v. Pennock, 168 N.H. 294, 310 (2015). "We apply the rule sparingly, its use limited to those circumstances in which a miscarriage of justice would otherwise result." Id. (quotation omitted). "To reverse a trial court decision under the plain error rule: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quotation omitted).

Here, even if we were to assume error, we conclude that the second criterion — that the error must be plain — is not met. "For the purposes of the plain error rule, an error is plain if it was or should have been obvious in the sense that the governing law was clearly settled to the contrary." Id. (quotation omitted). "When the law is not clear at the time of trial and remains unsettled at the time of appeal, a decision by the trial court cannot be plain error." Id. (quotation omitted). "'Plain' as used in the plain error rule is synonymous with clear or, equivalently, obvious." Id. (quotation omitted).

Because our law is unsettled, an error, if any, was neither "clear" nor "obvious." Id. (quotations omitted). There is some support in our case law for the proposition that the State must prove that the property at issue was, in fact, stolen, in order to obtain a conviction for receipt of stolen property. See State v. Stauff, 126 N.H. 186, 189 (1985) ("In order for the State to convict on the charge of receiving stolen property, it must prove beyond a reasonable doubt that the property was stolen, that the defendant possessed the property, that he believed the property was stolen, and that he intended to deprive the owners of the property.").

On the other hand, there is also support in our case law for the proposition that, to obtain a conviction, the State need show only that the property belonged to someone else. See State v. Stanley, 132 N.H. 571, 572-73

12

(1989) (to convict the defendant of receiving stolen property, the State did not have to prove, beyond a reasonable doubt, the specific identity of the owner of the property; rather, the State had to prove only that the property was "'the property of another'" (quotation omitted)); State v. Brown, 132 N.H. 321, 328 (1989) (rejecting the defendant's assertion that the trial court erroneously failed to set aside the verdict when neither he nor the State's expert could have ascertained that the aluminum had been stolen; simply because the State's expert was unable to determine whether the aluminum had been stolen did not require a fact-finder to find that the defendant likewise did not know that it had been stolen); State v. Wong, 138 N.H. 56, 65 (1993) (rejecting the defendant's contention that the evidence was insufficient because the State failed to prove that, when he purchased the Yamaha outboard motor, the Yamaha constituted stolen property and concluding that, to convict, the jury had only to find that the defendant received the "property of another").

Moreover, the Model Penal Code, from which our Criminal Code is largely derived, State v. Donohue, 150 N.H. 180, 183 (2003), makes clear that, to convict a defendant of receiving stolen property, "[t]here is no requirement . . . that the property in fact have been stolen; it is sufficient if the actor believes that the property probably has been stolen." Model Penal Code and Commentaries § 223.6 cmt. 4(b) at 239 (1980). Given the uncertainty in our law, any error in determining that the State could obtain a conviction without having to prove that the passport had, in fact, been stolen, was not "plainly evident" from our prior case law.

The defendant also argues that "the trial court . . . applied the wrong mental state to the evidence" because the trial court asked defense counsel during the argument on the defendant's motion to dismiss: "[S]houldn't your client have known that a landlord doesn't have permission to give something that belongs to an estate?" The defendant contends that this question demonstrates that the trial court believed that, to convict, the State had to show only that the defendant "should have known" that the property was stolen.

This argument misses the mark. Regardless of any erroneous belief that the trial court may have entertained as to the required mens rea for the offense, the court properly instructed the jury that, to convict the defendant of receiving stolen property, the State had to prove that he "knew that the property had been stolen or believed that it had probably been stolen." RSA 637:7, I. Under those circumstances, we decline to exercise our discretion to consider this argument under our plain error rule.

To the extent that the defendant contends that the evidence was insufficient for the jury to have found, beyond a reasonable doubt, that he knew that the passport was stolen or believed that it probably had been stolen, we disagree. "The essential element of guilty knowledge on the part of a

13

receiver of stolen property can rarely be proven by direct evidence but it may be demonstrated by any surrounding facts or circumstances from which such knowledge may be inferred." Stauff, 126 N.H. at 190 (quotations and brackets omitted).

The defendant argues, and the State does not dispute, that the evidence regarding whether he knew that the passport was stolen or believed that it probably had been stolen was solely circumstantial. When the evidence is solely circumstantial, it must exclude all reasonable conclusions except guilt. Morrill, 169 N.H. at 718. "Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation." Id. (quotation omitted).

There was evidence that the defendant works with others to obtain false identification documents so that an individual can obtain another identity, and thus, that the defendant would have had a reason to possess a stolen passport. The jury heard evidence regarding how he performs "backgrounds" on individuals, such as "Angel Berrios Rivera," for a fee. With regard to the "Angel Berrios Rivera" identity, the jury heard that the defendant looked for names "to try and consolidate the name and date of birth and the Social Security number" associated with that identity. His information was used to generate a false social security card, false birth certificate, and a false lease agreement, all in the name of "Angel Berrios Rivera," which were then submitted to the Manchester DMV so that Guzman could obtain a new identity. All of this evidence was probative of the defendant's mental state. See State v. Fennelly, 123 N.H. 378, 391 (1983) (holding that the defendant's transactions in Maine were admissible to prove that he received stolen property in New Hampshire because they constituted "evidence of a common scheme or plan"). From this evidence and the reasonable inferences to be drawn therefrom, viewed in the light most favorable to the State, the jury could have found, beyond a reasonable doubt, that the defendant knew that the passport was stolen or believed that it probably had been stolen. See RSA 637:6 (2016) (providing that a person commits theft when he "obtains property of another which he knows to have been lost or mislaid, . . . without taking reasonable measures to return the same to the owner, and . . . [he] has the purpose to deprive the owner of such property").

The defendant argues that the evidence was insufficient to "foreclose other rational conclusions, such as that the passport, with no identifiable monetary value, was abandoned upon [Riley's] death and the landlord was legally permitted to dispose of it." In so arguing, the defendant presumes that, in reviewing his sufficiency claim, we must assume that the jury credited his story of how he came to possess the passport. However, "where solely circumstantial evidence is at issue, the critical question is whether, even assuming all credibility resolutions in favor of the State, the inferential chain of circumstances is of sufficient strength that guilt is the sole rational

conclusion." <u>State v. Saunders</u>, 164 N.H. 342, 351 (2012) (emphasis added) (footnote omitted).

<u>Affirmed</u>.

HICKS, LYNN, BASSETT, and HANTZ MARCONI, JJ., concurred.