NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Coos
No. 2013-637


THE STATE OF NEW HAMPSHIRE

v.

ELIZABETH CLOUTIER

Argued:  October 16, 2014
Opinion Issued:  January 13, 2015


Joseph A. Foster, attorney general (Elizabeth C. Woodcock, assistant attorney general, on the brief and orally), for the State.


Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.


CONBOY, J.  The defendant, Elizabeth Cloutier, appeals her conviction by jury on one count of burglary.  See RSA 635:1 (2007) (amended 2014).  On appeal, she argues that the Superior Court (Bornstein, J.) erroneously denied her motion to suppress her confession.  We affirm.

The following facts are drawn from the trial court's findings and rulings or are otherwise supported in the record, which includes a video-recorded interrogation of the defendant.  On July 11, 2012, the defendant went to the Berlin Police Department to take a polygraph test in connection with an

investigation of an alleged burglary of the victim's home.  The defendant was a friend of the victim and had recently helped the victim locate a safe that had been stolen from her home.  The defendant met with retired New Hampshire State Police Lieutenant Healy who explained the voluntary nature of the polygraph test and informed the defendant that she could leave the police station at any time.  Healy also informed the defendant that the entire polygraph test and accompanying interview would be audio- and video-recorded and advised her of her Miranda rights.  See Miranda v. Arizona, 384 U.S. 436 (1966).  The defendant then signed a form acknowledging that she had read the enumerated rights and understood them.  She also signed a form stating that she agreed to take the polygraph test.

Before the polygraph examination began, Healy asked the defendant whether she was involved in the burglary and theft of the safe.  The defendant denied any involvement.  Healy then explained the polygraph test procedure and administered the polygraph test.  The entire polygraph test procedure took nearly four hours after which the defendant was given a short break.

When they returned from the break, Healy, joined by Detective Poulin and Lieutenant Plourde of the Berlin Police Department, questioned the defendant about the crime.  Healy informed her that, "All those rights I explained to you earlier, . . . they still apply.  This is still voluntary.  You still have the right to remain silent.  Nothing has changed."  Healy then told the defendant that based upon his review of the polygraph test results, he knew she was "withholding significant information."  Healy and Poulin repeatedly confronted her with their belief that she was involved in the burglary and theft of the safe and told her that they wanted to know why.  The defendant initially stated that she did not "have anything to say" about the polygraph test results, but then denied any involvement in the crime.  At one point, the defendant agreed with Plourde that video surveillance footage would show her and her daughter "over there."  Poulin asked the defendant whether her daughter was involved in the burglary, which the defendant denied.  Healy stated that he did not "want anybody making false accusations against" the defendant's daughter.  He explained that while he was "not suggesting they will, . . . she's always with you."  He suggested that the footage could be problematic for the defendant because it would place her and her daughter "where the safe was found."

Approximately thirty minutes after the break, Plourde began questioning the defendant.  He repeatedly told her that he was "100 percent certain" that she was involved in the burglary and implored her to explain why.  She said that she had "been hearing a few things" but that she was "not going to say any more about anything that [she had] heard."  Plourde continued to question the defendant and tell her that he was certain she was involved in the crime.  Plourde then stated:

2

I'm telling you that I don't think [the victim] would want us to handle this like we handle people who steal all the time. . . . I don't think you're this huge thief. It was an indiscretion, and it happened, and we deal with it from here. <u>But if we leave here today</u>, then, you know, we're not going to handle it that way. Whether what [the victim] says, . . . whether what she says or not. <u>We'll handle it like we handle . . . like somebody who's done this many times</u>.

(Emphasis added.) The defendant responded that she did not know what to say.

Plourde and Poulin continued to confront the defendant with their belief that she was involved in the burglary and urged her to tell them what had happened. At one point, one of the officers suggested that a possible reason the defendant took the safe was because of "an addiction" and that she needed money for pills. When she repeatedly told them that she did not have anything to say and continued to deny her involvement, they told her that they thought she was lying and that she was not a true friend of the victim. Shortly thereafter, the defendant stated, "Okay, I'll say I was involved, if that's going to make anything better . . . . No, I wasn't, but I'll say I was." When asked why she would admit involvement falsely, the defendant responded, "Just so I can go on my merry way, I guess. I don't know."

The interview continued and the officers again accused the defendant of being involved in the burglary. Plourde accused her of insulting his intelligence by telling them that she had some information, but continuing to deny involvement in the crime. One of the officers told the defendant, "You're not a prisoner here. The same rights apply right now as when you came in here. You're gonna leave here either way." She responded by telling them that she had taken the safe, but that she did not "know how [she] got it out of [the victim's] house" and "into [her] vehicle." She said, "I don't know how I banged the door open, but I got that open too. I don't know what you want me to say." At one point, she asked the officers, "What else do you guys want me to say?" The officers responded that they wanted her to tell the truth.

The defendant eventually admitted her involvement in the burglary, explaining to the officers how she and two others had taken the safe, opened it, and stolen its contents. She stated that she decided to admit her involvement "to get it off [her] chest . . . help [the victim], pay her back, go forward." Shortly after admitting her involvement, the defendant "express[ed] remorse" and began to "tear up and sob[]." Aside from this portion of the interview, the defendant "look[ed] relaxed" and "appeared lucid and self-possessed." She answered questions and made statements "in a normal conversational way," and did not appear "intimidated." After nearly six hours, the interview ended and the defendant left the police station. She was later charged with burglary.

Before trial, the defendant moved to suppress the statements she made following the polygraph test, arguing, in part, that they were involuntary, and, as a result, their admission at trial would violate her right to due process under the State and Federal Constitutions. Following a hearing, at which the parties presented legal arguments based upon the defendant's taped interview, the trial court denied the motion. The defendant's statements were admitted at trial through the videotape and Poulin's testimony. At the close of evidence, the defendant "renew[ed]" her arguments under the State and Federal Constitutions, and moved to dismiss the burglary charge on the basis that the State had failed to meet its "burden of proof beyond a reasonable doubt that [her] confession was voluntary." The trial court denied her motion.

On appeal, the defendant argues that the trial court erred in failing to find her confession was involuntary and, therefore, the admission of her statements at trial violated her right to due process under Part I, Article 15 of the New Hampshire Constitution and the Fourteenth Amendment to the United States Constitution. We first consider the defendant's argument under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

Under Part I, Article 15 of the New Hampshire Constitution, for a defendant's statement to be admissible at trial, the State must prove beyond a reasonable doubt that it was voluntary. State v. Wilmot, 163 N.H. 148, 151 (2012). Whether a confession is voluntary is initially a question of fact for the trial court. State v. Rezk, 150 N.H. 483, 486 (2004). We will not overturn a trial court's determination that a confession is voluntary unless it is contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State. Id.

To be considered voluntary, a confession must be the product of an essentially free and unconstrained choice and not extracted by threats, violence, direct or implied promises of any sort, or by exertion of any improper influence. State v. Zwicker, 151 N.H. 179, 186 (2004); see also State v. Copeland, 124 N.H. 90, 92 (1983). Thus, a confession is involuntary if it is "the product of a will overborne by police tactics, or of a mind incapable of conscious choice." State v. Hernandez, 162 N.H. 698, 706 (2011) (quotation omitted). In determining the voluntariness of a confession, we examine the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." State v. Belonga, 163 N.H. 343, 351 (2012) (quotation omitted).

Here, the defendant argues that Plourde's statement, "[I]f we leave here today, . . . [w]e'll handle it like we handle . . . like somebody who's done this many times," constituted "'a threat of harsher punishment should [she] remain silent,'" and asserts that the remaining circumstances of the interview "did not mitigate the effect of this threat." She contends that Plourde's threat, in

4

combination with certain other circumstances, "foreclosed any rational conclusion that her confession was voluntary beyond a reasonable doubt."

Although we have never explicitly evaluated the impact of alleged threats of harsher punishment during police interrogation, cf. State v. Rodney Portigue, 125 N.H. 352, 364-65 (1984) (concluding that, under totality of circumstances, officer's threat of future prosecution did not overbear defendant's will so as to vitiate voluntary nature of defendant's statements), in Rezk, we examined the nature of police promises of leniency and the impact they may have had on the defendant's decision to confess. Rezk, 150 N.H. at 487-92. Based upon the facts in that case, we found that the defendant's confessions were induced by specific promises of leniency and were involuntary. Id. at 491. In our analysis, we likened a specific promise of leniency should the defendant confess to a threat of harsher punishment should the defendant remain silent. Id. at 490. We explained that "[b]oth types of statements are simply different sides of the same coin: waive your rights and receive more favorable treatment versus exercise your rights and receive less favorable treatment. Both types of statements are antithetical to State and federal constitutional values." Id. (quotations omitted and citation omitted).

Under the totality of the circumstances test, however, the existence of a promise or threat is not dispositive. See id. at 488; see also United States v. Jacques, 744 F.3d 804, 810-11 (1st Cir. 2014) (examining the totality of circumstances to determine whether officer's threat of retaliation rendered confession involuntary), cert. denied, 135 S. Ct. 131 (2014); Portigue, 125 N.H. at 364. "Rather, all the facts must be examined and their nuances assessed to determine whether, in making the promise [or threat], the police exerted such an influence on the defendant that his will was overborne." Rezk, 150 N.H. at 488 (quotation omitted); see also Jacques, 744 F.3d at 809. Factors relevant to determining whether police promises or threats render a confession involuntary include: (1) the nature of the promise or threat; (2) the context in which it was made; (3) the characteristics of the individual defendant; (4) whether the defendant was informed of his or her Miranda rights; and (5) whether counsel was present. Rezk, 150 N.H. at 488; see also Jacques, 744 F.3d at 809-11.

With these factors in mind, we analyze whether Plourde's statement constituted an impermissible threat. As to the first factor, the defendant contends that the nature of Plourde's statement constituted a threat of harsher punishment should she not confess. She cites several cases from other jurisdictions in which courts have found that threats of harsher punishment rendered an ensuing confession involuntary. See United States v. Harrison, 34 F.3d 886 (9th Cir. 1994); Beavers v. State, 998 P.2d 1040 (Alaska 2000); State v. Strayhand, 911 P.2d 577 (Ariz. Ct. App. 1995); Passama v. State, 735 P.2d 321 (Nev. 1987); State v. Tuttle, 650 N.W.2d 20 (S.D. 2002). She maintains

5

that Plourde's statement in this case is indistinguishable from "the threats at issue" in those cases. We disagree.

In Harrison, a federal agent told the defendant "that she might be facing up to twenty years in prison" and then asked "whether she thought it would be better if the judge were told that she had cooperated or had not cooperated." Harrison, 34 F.3d at 890, 892. Similarly, in Strayhand, a detective warned the defendant that he would "ask for a lot of jail time because [the defendant was] not going to cooperate with [him]," Strayhand, 911 P.2d at 582 (quotation and emphasis omitted), while another detective stated that he "was going to hang [the defendant] in court," that the defendant "was going to do some big time unless he cooperated" with the detectives, and that "his cooperation matters on the amount of time" the defendant would receive, id. at 583 (quotations omitted). Likewise in Tuttle, a detective told the defendant that he was going to "have to write it up that you're not cooperating, you're being a real jerk about it." Tuttle, 650 N.W.2d at 35 (quotation omitted). Finally, in Beavers, a state trooper told the defendant "that he would be 'hammered' if he attempted to hide his conduct from [the trooper] and that 'we're going to have to talk about that.'" Beavers, 998 P.2d at 1048. See also Passama, 735 P.2d at 323 (sheriff told defendant "he would go to the D.A. and see [defendant] went to prison if he was not entirely truthful").

Unlike the statements in those cases, to the extent Plourde's single statement constituted a threat, it was not a threat "to inform the prosecutor or the judge of" the defendant's refusal to cooperate. Tuttle, 650 N.W.2d at 36. Nor did his statement convey "an unmistakable message that [the defendant] would be punished" if she remained silent and failed to admit her involvement in the crime. Beavers, 998 P.2d at 1048; see also Harrison, 34 F.3d at 891. Indeed, it is unclear what Plourde meant by this single statement. Nonetheless, even were we to assume that Plourde's statement constituted some sort of threat, our review of the video recording discloses no indication that this statement overbore the defendant's will or had any impact upon her conduct during the interview so as to render her confession involuntary. See Hernandez, 162 N.H. at 706; see also Jacques, 744 F.3d at 811; cf. State v. Monroe, 142 N.H. 857, 864 (1998); State v. Carroll, 138 N.H. 687, 692-93 (1994).

Before Plourde's statement, the defendant consistently denied involvement and refused to share any information she might have had about the crime. Following Plourde's statement, the defendant continued to tell the officers that she did not have anything to say and that she was "not sharing anything." Significantly, it was not until approximately fifty minutes after Plourde's statement that the defendant fully admitted her involvement and explained how the crime occurred. During that time, the officers continued to tell the defendant that they thought she was lying and that she was not a true friend of the victim. At one point the defendant stated, "Okay, I'll say I was

6

involved, if that's going to make anything better . . . . No, I wasn't, but I'll say I was." When asked why she would admit involvement falsely, the defendant responded, "Just so I can go on my merry way, I guess. I don't know." Subsequently, the officers reminded the defendant, "You're not a prisoner here. The same rights apply right now as when you came in here. You're gonna leave here either way." They continued to question the defendant and to tell her that they wanted to know the truth, and the defendant eventually admitted her full involvement. These circumstances support a finding that the statement did not serve to overbear the defendant's will or strip her of her "capacity for self-determination." Rezk, 150 N.H. at 489 (quotation omitted).

Our review of the record reveals no other factor that undermines the trial court's finding of voluntariness. Although the defendant was at the police station for nearly six hours, an interview of this length, in and of itself, does not render a statement involuntary. See Belonga, 163 N.H. at 356 (holding that six and one-half hour interview did not render confession involuntary). What is of paramount importance is what occurred during the interview. Id. Here, there was no evidence that the defendant "needed or was deprived of food, medical attention, or sleep." Carroll, 138 N.H. at 695. Further, as the trial court found, the defendant's demeanor on the videotape is consistent with finding her statements voluntary. The trial court found that she "look[ed] relaxed" and "appeared lucid and self-possessed." She answered the officers' questions and made statements "in a normal conversational way," and did not appear "intimidated." Although at the end of the interview, the defendant began to "tear up and sob[]," this alone is not dispositive. As the trial court concluded, "the tears and the emotional disturbance" demonstrated "remorse," "not the sign of a person . . . whose will has been broken." Absent overreaching, deception or coercion by the police, a defendant's emotional response to an interview does not render her confession involuntary. See Belonga, 163 N.H. at 353. Here, the defendant's emotional response occurred after she had admitted her involvement in the crime, and there is no evidence that the officers impermissibly exploited her emotional state to coerce a confession. See id.

Moreover, Healy reviewed the defendant's Miranda rights with her at the beginning of the interview and the defendant signed a form indicating that she had read her rights and understood them. Following the polygraph test, the defendant was twice reminded that those rights continued to apply. Although compliance with Miranda does not conclusively establish that a defendant's subsequent statement was voluntary, it is one of the factors the trial court may consider. Hernandez, 162 N.H. at 706. To the extent the defendant claims that on several occasions "she attempted to invoke her right to remain silent" and "the officers ignored her and continued the interrogation," the trial court found that the defendant did not invoke her right to remain silent and the defendant has not appealed that finding.

7

As evidence that her statements were involuntary, the defendant points to the fact that she "was alone, with no attorney present," and claims that there "was no evidence suggesting that [she] was a hardened veteran of the criminal justice system." It is undisputed that the defendant was alone with the police when she confessed, without the benefit of counsel. However, the defendant was not in custody and the officers reminded her on at least one occasion that she was free to leave. Moreover, her apparently minimal prior experience with police does not necessarily imply that she could not make a meaningful choice. See id.

The defendant further argues that the officers' repeated statements that "the polygraph was infallible, and conclusively established her guilt" weigh in favor of her involuntariness claim. The use of polygraph results in questioning, however, is not inherently coercive, but merely a factor to be considered in examining the circumstances surrounding a confession. Monroe, 142 N.H. at 866. Here, the defendant voluntarily consented to the polygraph test and "cannot, therefore, persuasively argue that [her] confession was coerced by a test that [she] voluntarily took." Id. (quotation omitted). Even assuming the officers misled the defendant regarding the polygraph results, "the police are not prohibited from misleading a suspect." Hernandez, 162 N.H. at 706; see also State v. Hall, 148 N.H. 671, 673 (2002) ("Although the officers may have misled the defendant into believing they had incriminating evidence, their comments were not so deceptive as to render the confession involuntary.").

The defendant also claims that the officers suggested that her refusal to confess could result in false accusations against her daughter. Under some circumstances a confession may be rendered involuntary because the police unreasonably exploit a person's compassion for a loved one. Belonga, 163 N.H. at 352. For example, courts have held that a confession may be involuntary when police make threats to arrest a suspect's family members. Id. (citing cases). Here, however, the officers did not make such a threat. Rather, they merely questioned whether the defendant's daughter was involved after the defendant agreed that video surveillance would show her and her daughter "over there." Thus, this is not a case in which the police impermissibly used a defendant's compassion for a loved one to "extract a statement." Id. at 353 (quotation omitted).

Finally, the defendant claims that the officers were, at times, "insulting and used profanity," suggested that her "medication 'affected her intellect,'" and that she was "'not a true friend of [the victim].'" (Brackets omitted.) Although the officers were "not entirely friendly and sedate," State v. Carpentier, 132 N.H. 123, 129 (1989), the interview consisted mainly of questioning in a reasonable tone. To the extent the officers raised the defendant's use of medication, they did so as a possible reason for why they thought she may have taken the safe. Under the circumstances of the interview, the defendant could not have expected that her conversation with

the officers would occur without any confrontation or intimation that she might be connected to the crime or questioning as to why she might be connected to the crime.  See id.

In this case, the evidence supports the trial court's conclusion that the defendant's statements were the product of a free and unconstrained choice. Based upon the evidence before the trial court, we cannot say that its determination was against the manifest weight of the evidence.  See Rezk, 150 N.H. at 486.  Accordingly, we affirm the trial court's finding that the defendant's statements were voluntary.

Under these circumstances, the Federal Constitution offers the defendant no greater protection than does the State Constitution.  Belonga, 163 N.H. at 357.  We, therefore, reach the same result under the Federal Constitution as we do under the State Constitution.  Id.

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.